## Asa Low v. The Connecticut & Passumpsic Rivers Railroad.

Where opposition to a charter of a railroad, or the modification of one already granted, is made in the legislature merely to protect a private interest, and the party is induced to withdraw that opposition in consideration of indemnity secured to him, the courts will enforce such indemnity, unless from the peculiar circumstances of the case the legislature was liable to be misled, and to do what it would not have done had not the transaction been concealed from its knowledge.

Therefore, where an agent of a railway company rendered services in procuring a division of its charter, it is no defense to his claim for compensation, that, to induce another company to withdraw an unreasonable opposition to such division made upon merely private grounds, the agent threatened to cause its unlawful use of part of the route of his principal to be restrained by injunction.

On the division of the route of a railway company which extended from the northern to the southern line of Vermont, and which was divided at White River, the Northern Company retaining the northern portion of the route, with all the subscriptions for the capital stock, and the original corporate name—*held*, that this was not to be deemed a new corporation but rather a continuation of the original one with a diminished franchise; and that having after its organization elected to take the benefit of plaintiff's services in effecting such division and organization, and obtaining subscriptions for stock with a knowledge of those services, and that compensation was claimed for them, the defendant was bound to pay what those services were reasonably worth.

*Held*, also, that a provision in the charter making the corporation liable for preliminary services and other specified services before the organization, but not including such services as plaintiff's, did not affect the plaintiff's right to recover upon the ground of a subsequent ratification.

Upon the question whether defendant had notice of plaintiff's services, the jury might properly consider the public nature of those services in connection with other evidence, although general notoriety is not of itself admissible.

Evidence that it was understood and talked among the directors, of whom plaintiff was one, that such services were to be rendered without compensation, was not admissible without showing him to be present.

The acceptance of the subscriptions, obtained by the plaintiff, with notice of his claim, is equivalent to an antecedent request, and they were not of a kind that could not be rejected.

If a majority of the stockholders at the time the corporation was organized knew of the existence of the plaintiff's claim, or of the material facts upon which it was founded, or had such information as put them upon inquiry in respect to it, the notice was sufficient.

The ratification of the assumed authority under which- the plaintiff acted by accepting the benefits of his services with notice of his claim was equivalent to an antecedent request, even if there was at the time no party empowered to make such request.

If the original promoters of the enterprise, although not authorized to bind the corporation, had promised the plaintiff that he should receive compensation from the corporation for his services, and for the injury to his business, and the corporation had, when organized, taken the benefits of those services, with notice of such promise, it would be bound to perform it.

In Assumpsit. Under the common counts, the plaintiff, in his specification, claimed to recover for his labor and services in organizing said railroad company, in procuring subscriptions to its capital stock, and getting it into operation, from January 1, 1845, to January 15, 1846, $5000 ; also, for one horse, delivered to Addison Gilmore, for services by said Gilmore rendered to said company, at their request, $300.

Under the general issue, it appeared that by an act of the legislature of Vermont, passed November 10, 1835, it was enacted that Gardner C. Hall and others, twenty-one in all, "with such others as shall associate with them for that purpose, be and hereby are constituted a body politic and corporate, by the name of the Connecticut and Passumpsic Rivers Railroad Company, with power to construct a railroad from the southern boundary of Vermont up the valleys of the Connecticut and Passumpsic, to the north line of the State ;" the capital stock to be $2,000,000, and the act to be void unless $20,000 should be expended upon the road within five years. Erastus Fairbanks, Gardner C. Hall and four others were appointed commissioners "to open books to receive subscriptions to the capital stock," and when subscribed "to give notice of a meeting of the stockholders to choose directors, &c."

By an act of October 31, 1843, the corporation was revived, subject to a similar condition, and commissioners were appointed, as before. In the fall of 1845, (November 10,) said company was, by an act of the legislature of Vermont, divided into two companies, the corporators in the original charter being the corporators in each. White river, at or near its mouth, was the point of division of the line of the route ; the northern company to retain the name of the original corporation, and all the subscriptions to the capital stock thereof; and the southern company received the name of the Connecticut River Railroad Company. Gardner C. Hall, Calvin Townsley, John R. Blake, James Keyes, and Peyton R. Chandler were, by the last mentioned act, appointed commissioners. Books were opened by said commissioners for receiving subscriptions to the stock of the northern company, about the first of July, 1845, and sufficient stock having been subscribed to enable the company to organize and commence operations, according to the provisions of its charter, on the 15th day of January, 1846, a meeting was duly holden at Wells River, Vt., at which the corporation was organized by the choice of directors and other necessary officers, and the stock accepted, and on the same day, at a meeting of the directors, an assessment was made upon the stock. In obtaining subscriptions to the stock prior to the organization, the plaintiff performed services. He was largely engaged in business in Bradford, Vt., and owned a large quantity of real estate in Bradford, on or near the line of the defend-

ants' road, and, with others, engaged early in efforts to excite an interest in the building of the road.

The evidence tended to show that between January 1, 1845, and January 15, 1846, he collected maps and statistics, showing the feasibility of the road, and the probable amount of travel and transportation upon it; that he was active in getting up meetings of those interested in the road at various places in the country, at which meetings he was present, with such maps and statistics as he had collected, and was successful in exciting an interest in the enterprise; that he was urged by individuals, not then corporators, who took the principal lead in the movement, to visit and remain in Boston, Mass., for the purpose of exciting an interest in the project among Boston capitalists, who were supposed to have an interest in it; that on his objecting, on account of his own private business at home, he was assured by said individuals that he should be paid for his services and the injury to his business; that he did visit Boston, and remained there for a considerable time, exerting himself to induce capitalists to subscribe to the stock of the road, exhibiting and explaining his maps and statistics. The plaintiff testified that he expected to be paid for his services, and that most of those who promised him afterward became stockholders. In the course of his services he was requested, in letters and otherwise, by some of the original corporators, to persevere in his exertions.

The plaintiff was not an original corporator, but became a stockholder, or subscriber for stock, before the organization of the company.

It appeared that the route of the defendants' railroad, under the original act of incorporation, extended from the south to the north line of the State of Vermont, through the valleys of the Connecticut and Passumpsic rivers, and it became important to the interest and success of the company that there should be a division of the route, at or near the mouth of White river, and a bill was introduced for that purpose into the legislature of Vermont, at Montpelier, in the fall of 1845, the passage of which was opposed by the president of the Vermont Central Railroad and others interested in that road, and it appeared that the Vermont Central Railroad Company had, without right, commenced building their road from White river down Connecticut river, over the route embraced in the defendants' charter; and Low testified that, in order to prevent opposition to said division, he went from Boston to Montpelier, and that he threatened the president and friends of the Central Road with an injunction against further proceedings in building their road over the route of the defendants' road, as aforesaid, unless they withdrew their opposition to the bill, and so succeeded in preventing further opposition to said bill, and the bill was enacted, and the division effected. The defendants requested the court to instruct the jury that no recovery could be had for the services Low claimed to have performed at Montpelier, in causing the withdrawal of the opposition to the act for the division of the charter, by threatening to enjoin the opponents of the measure from what they were doing in regard to the southern part of the line of the road, as stated by Low.

The court declined so to charge, but instructed them that if the Ver-

mont Central Railroad, while they were unlawfully using the route of the defendants' road, were making unreasonable opposition to the bill, and the plaintiff threatened that he would have them enjoined against the further unlawful use of the defendants' route, that would not prevent him from recovering for his services in procuring the passage of the bill, though the opposition of the Vermont Central Railroad was withdrawn in consequence of the threat.

The plaintiff offered evidence to show that the corporation accepted the subscriptions to the stock, with the knowledge or notice of the plaintiff's services in obtaining them; and the defendants requested the court to instruct the jury that they were not at liberty to infer, from the fact that one, or any number of subscribers to the stock of the corporation, short of a majority of them, had notice of the plaintiff's claim, that therefore *the corporation* had such notice. The court declined so to instruct, except as is elsewhere stated in the case.

The defendants requested the court to charge the jury that the plaintiff could not recover for his services, unless it should appear, either that a majority of the original corporators promised that he should be paid for them, or unless the corporation accepted the services, and took the benefit of them, with prior notice that the plaintiff claimed compensation for them, and that notice to any number of the corporators, short of a majority of them, or of the holders of a majority of the stock, would not be notice to the corporation of such claim. The court declined so to charge, except as is elsewhere stated in the case.

The defendants requested the court to charge the jury that the provision, at the close of section 4 of the original charter, providing for payment, by the corporators, of the expenses of surveys and examinations, and of preliminary surveys, already made and making, and all manner of incidental expenses relating thereto, had the effect to exclude the services in question in this suit. The court declined so to charge, and the defendants excepted.

The defendants requested the court to charge the jury that evidence of general notoriety was *not* competent to prove notice to the corporation of Low's services; such evidence, tending to prove such notoriety, having been introduced by the plaintiff. The court did not so instruct the jury, but did instruct them that mere notoriety was not sufficient of itself to charge the defendants with notice, but that the public nature of the services rendered might be considered in connection with other evidence on the question, whether the stockholders had in fact knowledge of his services.

The defendants requested the court to charge the jury that, in order to bind the company to pay for the services, there must have been knowledge or notice to the company, or to stockholders, holding a majority of the stock, before, or at the time of, the organization, that the plaintiff had rendered the services, with the understanding, or expectation, on his part, when they were rendered, that he was to be paid for them. The court declined so to charge, but instructed them that it was not necessary that the defendants should have notice that the plaintiff did not render his services gratuitously; but if his services were of such a char-

acter as they would have reasonable ground to suppose he would render, without pay, they would not be charged with notice that he made any claim to pay.

The court instructed the jury that, although they could not give the plaintiff anything, on account of damage resulting to his private business from the performance of the services in question, yet, that when the jury came to inquire what the nature of the plaintiff's services were, they were at liberty to consider the value put upon the services by the persons who employed him on account of the corporation, as a circumstance tending to show what the value of his services was; and if those persons said he should be paid for the amount of the damage to his business, that was an indication of the value which they put upon the services; *to which instructions the defendant excepted.*

The plaintiff testified that he went to Canada with a paper, signed by certain capitalists in Boston, containing an assurance that they would aid in getting up the capital stock of the road, upon the condition that certain things should be done by the people in the country upon the line of the proposed road; and he also offered to testify, that, before going to Canada, he made diligent inquiry, with a view to ascertain the pecuniary ability of the men who signed said paper, and received in reply the strongest assurances that there were two or three of said signers who were of sufficient ability to build the whole road. The defendants objected to the plaintiff's stating what was said as to the pecuniary ability of those persons, but it was admitted, *not* to show that those men were in fact able, but for the purpose of showing that the plaintiff used diligence; and the defendants excepted.

The deposition of. Epaphras B. Chase was offered as evidence by the defendants, and read to the jury, with the exception of a clause included in the answer to one interrogatory. The whole of said answer was as follows, namely: "I have never received any compensation for my services, and have never made any claim for compensation." (It was understood that we were not to have any compensation—so understood, and talked by the directors.") The witness had before testified that he performed services in obtaining subscriptions to the stock, prior to the organization of the company, and it appeared that said Low and Chase were members of the first board of directors, and continued to be such directors for several years after the organization. The part of said answer, included above in parenthesis, it not appearing that the plaintiff was one of the directors referred to, or was present when the matter was talked by them, was ruled out by the court, and the defendants excepted. The deposition may be referred to on the hearing.

The court ruled that nothing could be recovered for the loss of the plaintiff on the stock subscribed for by Blodgett. Under instructions as to the law, the jury returned that they had found nothing for the horse delivered to Gilmore.

The court instructed the jury that the corporation was liable for services necessary to perfect its organization, and which, when such organization was perfected, it accepted and enjoyed the benefits arising therefrom; that services in obtaining subscriptions to the capital stock, which

were accepted by the corporation at their organization, would be such necessary services; that, to enable the plaintiff to recover, the services must have been necessary and reasonable, and not gratuitously rendered, but with the understanding and expectation that they were to be paid for:

That though the promoters of the enterprise, who undertook to employ the plaintiff, had no authority to bind the corporation by a contract, yet, if the plaintiff went on in an arrangement with them to perform such services, and the defendants, with due notice, received the benefits of them, they would be deemed to have ratified the arrangement, so far as to be bound for the services, if they were not gratuitous:

That, to bind the corporation by such ratification, it would be essential that it had previous knowledge or notice of the existence of the claim, or of the material facts upon which it was founded, or that it was put upon inquiry with respect to it; as to what should be regarded as sufficient notice, and what should put the stockholders upon inquiry, the court instructed the jury that if the holders of the majority of the stock, at the time when the corporation was organized by the choice of officers, had such information of what had been done by the plaintiff in the business of the corporation as would lead them to understand that he had performed services for which he was justly entitled to compensation from the corporation, and without inquiry proceeded to organize the corporation, and so received the benefit of his services, the corporation would be bound to pay him a reasonable compensation for the benefit received.

The charter provided that, in votes of the stockholders, each share of the stock should be entitled to one vote. A printed copy of the charter and several amendments may be referred to on the hearing.

The jury returned a verdict for the plaintiff, which the defendants move may be set aside on account of the said rulings and exceptions.

*Ormsby & Bingham*, for plaintiff.

*Felton*, (with whom was *Hibbard*,) for defendant.

Public policy requires that legislative acts should be passed, or not, upon their own merits, and that no collateral influences should be brought to bear for or against them. In this case opposition to the division of the charter was withdrawn in consequence of Mr. Low's threat in relation to a matter that had no connection with the merits of the case, and the division was made, not because the public interest required that it should be made, but because the threat deterred men from opposing it. See *Knowles' Petition*, 22 N. H. 361; *Dudley* v. *Cilley*, 5 N. H. 558; *Gurnsey* v. *Edwards*, 26 N. H. 224; *Commonwealth* v. *Sawin*, 2 Pick. 547; Redfield on Railways, 663, 664, sec. 15; *Dudley* v. *Butler*, 10 N. H. 281.

The services performed by the plaintiff, in bringing about a division of the charter, were substantially services performed in procuring a new

charter, and the corporation cannot be made chargeable for such services. *Hall* v. *Vt. & Mass. Railroad*, 28 Vt. 401, 406.

The new corporation, created by the division, cannot be charged for services performed for the original corporation before the division. In order to bind a corporation, by a promise of the original corporators, a majority of the corporators must concur in making the promise. See 45 N. H. 379, *Low* v. *Railroad*. The court were requested so to charge the jury, but declined to do that, or anything equivalent thereto.

If notice of the plaintiff's services to any number of the subscribers, or to subscribers for any amount of the stock, would have made the corporation chargeable, there should have been strict evidence of actual notice to a majority, and not mere circumstantial evidence from which notice might, or might not, be inferred; but no notice to mere subscribers could be notice to the corporation. Notice *to the corporation* was necessary. It was so held in the former decision 45 N. H. 379, or it was held that the corporation must *at least* be put upon inquiry. The court did not there say that it would be sufficient that the corporation should be put upon inquiry merely, and we contend that it would not.

The subscribers to the stock were not corporators until their subscriptions were accepted. Yet, according to the charge, it was the very act of accepting the subscriptions, with notice, to the subscribers, of the plaintiff's services, that was to make the corporation chargeable. The subscribers were not the corporation, nor its agents at any time, nor were they authorized to receive notices required to be given to the corporation. Individual subscribers might have had notice that the plaintiff had performed some services, without knowing how much or under what circumstances. Could such notice charge the corporation to an indefinite extent? It would according to the charge. Other persons were performing similar services without compensation. Subscribers knowing this, and seeing no distinction, would have reason to suppose that no one claimed compensation, especially as such services were generally performed gratuitously. There should have been notice that the plaintiff claimed compensation.

The subscribers had no right to object to the plaintiff's services, or to forbid the performance of them, as individuals for whom services are performed might do; and, if they had the right, it would have been impracticable for them to exercise it. Objection by one would have been unavailing. All who had knowledge of the services must have objected. Many who had the knowledge were not subscribers at the time the services were performed. Much of the service was performed before there were any subscribers.

There is no question here about any ratification, by the corporation, of any express promise to pay, because there is no evidence that the subscribers to a majority of the stock knew anything about any such promise. Without such knowledge there could be no ratification. See Story on Agency, secs. 239, 253 and 254.

This action cannot be maintained, because there being no express promise or request to perform, the services must have been alleged and

proved, or, at least, the facts must have been such that a request could be inferred; but there was no party in existence when the services were performed, except the original corporators, competent to make the request, and they did not make it, nor did a majority of them know of the services; nor could they have made it for the *new corporation* created by the division of the charter.

The acceptance of the subscriptions afterwards could·not make the corporation chargeable. The services were not performed upon any property of the defendants, so as to be incorporated with the property and make part of its value, nor were they property themselves, of which, by accepting it, the defendants would become purchasers, and, if they had been, the declaration would not have been adapted to the case. On these grounds no action at law can be maintained. 1 Chitty's Pleading 338; 1 Sanders' Rep. note 1.

The services were of such a nature that the defendants could not have rejected them after they were performed, nor could they refuse the benefit of them. There was, therefore, no voluntary acceptance of them. The services consisted, not in directly obtaining subscriptions by the defendant himself, but in exciting an interest in the enterprise. The subscription books were paid for by the corporation, and placed in the hands of persons, other than Mr. Low, who received the subscriptions, and returned the books to the company, Low having neither the possession of them, nor any interest in or right to them. The services resulted in nothing valuable to the plaintiff, if the defendants had not received the benefit of them.· The defendants took nothing from the plaintiff, nor from any one, which the plaintiff had a right to withhold from them. Those who received the subscriptions had a better right than the plaintiff, to dispose of them—a perfect right to them as against the plaintiff. The subscribers, too, had a right to have their subscriptions received. The subscriptions constituted, when accepted, contracts between the subscribers and the defendants, and the obtaining of them was no more for the benefit of the corporation than of the subscribers. A corporation receives the benefit of services performed in obtaining its charter. If the acceptance of the benefit of the services of the plaintiff is to make the defendants chargeable, there is no reason why accepting the benefit of services performed in obtaining their charter should not charge them, but it would not. It was so decided in *Hall* v. *Railroad*, 28 Vt. Rep. 401, which is a Vermont authority. It would make no difference whether the services were performed before or after the corporation was in esse, because the liability would result, not from the performance of the services, but from the acceptance of them with notice of the performance.

Services performed for one, without his request, does not make him chargeable. *Bartholomew* v. *Jackson*, 20 Johnson's Rep. 28; 1 U. S. Dig. p. 277, sec. 245; even though he is ever so much benefited by them.

There was no necessity for performing the services in controversy without authority, because the original corporators might have been applied to. The fact that they were not called on is strong evidence that

the services were intended to be gratuitous. *Hughes* v. *Parker*, 20 N. H. 69 ; *Low* v. *Railroad*, 45 N. H. 379.

Between the case in controversy and the cases of subscriptions to stock, referred to in the former opinion, I see no analogy. In those cases the subscribers made express written promises to corporations in being, upon sufficient consideration, to take stock and pay for it, which promises were accepted by the corporations prior to any revocation of them, and after organization.

In the case *Preston* v. *Railway*, in 7 Law & Equity Reports, referred to in the former opinion, there was an express contract made by the promoters with Preston in behalf of the company, which, with full knowledge of the contract, and the benefits to be derived from it, was accepted and ratified by the corporation, after its charter was obtained, by setting out the line of the railway over Preston's lands, and giving him notice that the lands would be required. Besides, the mode of instituting railway enterprises in England differs from that in practice here. The promoters of railways in England form preliminary associations, which become the corporations, and are identical with them, and the corporations are, therefore, charged with their acts, and their knowledge, and bound by their contracts. Redfield on Railways, 631, 632, 633, 634, 635, 636 and 637, secs, I, II and III. The English cases are, therefore, not applicable here. The promoters in England associate together, and are recognized, in law, as associates before incorporation. They make contracts, and become incorporated, and are bound after incorporation by contracts made before incorporation, but, because the corporation is not, in law, the contracting party, the remedy upon the contract is in chancery for a specific performance, only, on the ground of privity of interest, there being no privity of contract, and the contract not being negotiable.

The provision at the close of the 4th section of the original charter, by implication, excludes any claim for the plaintiff's services—"*Expressio unius exclusio alterius est.*" *Sherwin* v. *Bugbee*, 16 Vt. Rep. 445. The surveys mentioned in the 4th section would be *necessary,* in order to determine whether the road could be built at all, and whether, therefore, it would be expedient to obtain a charter, or take any steps towards building the road, and would require an actual expenditure of money. Other preliminary services are usually performed without such expenditure. Hence the distinction made in the charter.

The instruction requested in respect to evidence of general notoriety should have been given. General notoriety is strongly analogous to general reputation. In matters of private interest, both stand on the same ground as to admissibility. The court, by the charge, gave the jury to understand that evidence of notoriety was competent to prove notice, and was to be considered for that purpose. See 1 Greenleaf on Evidence, secs. 137, 138.

"The value put upon the (plaintiff's) services, by the persons who employed him on account of the corporation," was no more than the opinions of persons who had no authority to act for the corporation, as

to the value of the services.  *Low* v. *Railroad*, 45 N. H. Rep. 381, 382, 383.

The plaintiff's testimony as to what was said about the pecuniary ability of the signers of paper which he carried to Canada, was a statement of mere hearsay, and incompetent for any purpose.

The clause in E. B. Chase's deposition which the court ruled out was competent.  The statement, "it was understood that we were not to have any compensation, so understood and talked by the directors," properly construed, means that it was "so understood and talked by all the directors."  The plaintiff was one of the first board of directors, and continued to be a co-director with Chase and others, for several successive years next after the organization.  To this point see *Clough* v. *Bowman*, 15 N. H. 514.  A reasonable degree of certainty is all that should be required in the expressions of a witness.

BELLOWS, J.  The first question is upon the instructions of the court in regard to the services of the plaintiff in procuring a division of the charter.  Those instructions were, that, if the Vermont Central Railroad, while unlawfully using the route of the defendants' road, were making unreasonable opposition to the bill, and the plaintiff threatened to have them enjoined against such use, that would not prevent him from recovering for his services in procuring the passage of the bill, though the opposition of the Vermont Central Railroad was withdrawn in consequence of the threat.  The request was to charge the jury that no recovery could be had for such service in procuring a withdrawal of this opposition by means of such threat; and it was upon the ground that this act of the plaintiff was against public policy and illegal.  We think, however, that these instructions were right.  If the Vermont Central Railroad was making opposition to this bill upon grounds, not of a public character, but to protect or advance its private interests, the plaintiff might lawfully induce that corporation to withdraw such opposition by considerations bearing upon its private interests.

In repeated instances this has been sanctioned by the English courts, in cases where individuals and turnpike and bridge companies have been induced to cease their opposition to the incorporation or extension of railways by indemnities for the injuries likely to be caused by such railways.  There might be cases where the withdrawal of opposition to such bills, caused by compensation secured to the persons making it, would be against public policy and illegal, although such opposition was merely of a private nature, as when the fact of compensation was by design concealed from the legislature by the parties, knowing that the nature of the case was such that the legislature would be misled by the withdrawal of opposition, and might be induced to do what, with a knowledge of all the circumstances, they would not do.

If, however, the opposition was of a private character, and merely to protect private interests, and it was afterwards withdrawn in consideration of a satisfactory indemnity for the injury anticipated, and there was no purpose to conceal the arrangement from the legislature, we do not perceive that it would be open to objection ; and the cases are numerous

in England where such arrangements are held to be valid.  Among those cases are *Howden* v. *Simpson*, 10 Ad. & El. 793, in the Exchequer Chamber, on Error from the Queen's Bench in 1839, affirmed in the House of Lords ; see Red. on Rail. 646, n. 1 ; *Vauxhall Bridge Co.* v. *Earl Spencer*, 2 Mad. 356 ; *Edwards* v. *Grand Junction Railway*, 1 My. & Cr. 650, quoted in Redfield on Railways, 641, sec. 7, and *Hawkes* v. *Eastern Counties Railway Co.*, 15 Law & Eq. 358, decided in 1852, where there was a very able opinion of the Lord Chancellor, Lord St. Leonards.  In that case the railway company had a bill in Parliament to authorize them to build a branch, or an extension of their railroad, which would cross the land of the plaintiff, who, on that account, opposed the passage of the bill ; but he was eventually induced to withdraw his opposition in consideration of their agreement to buy his estate of about six acres of land and a house thereon for £8000, and the further sum of £5000 by way of additional compensation, for removing his business, &c.  Whereupon he did withdraw his opposition, and the bill passed.  On a bill in equity, specific performance of this agreement was decreed, although the road was not built, or the land taken.  In this opinion to the same point are cited *Stanley* v. *The Chester & Birkenhead Railway*, 1 Rail. Cases 58, and *Gooday* v. *The Colchester & Stour Valley R. R.*, 15 Law & Eq. 596.

The cases fully establish the doctrine in England that where opposition is made to a railway project in Parliament merely to protect a private interest, and the party is induced to withdraw that opposition in consideration of an indemnity secured to him, the courts will enforce such indemnity, unless from the peculiar circumstances of the case the legislature were liable to be misled, and to do what it would not have done had not the transaction been concealed from its knowledge.  In such cases the concealment is an important element in determining the character of the transaction ; see *Howden* v. *Simpson*, before cited ; and it is, therefore, judicious in many instances to let the substance of the arrangement appear in the bill to avoid all appearance of concealment.  If, however, the opposition be obviously of a private nature, and is afterwards withdrawn upon satisfactory indemnity openly given and received, although not stated in the bill, we think there could ordinarily be no objection to it, and yet all arrangements of this kind ought to be watched with a jealous scrutiny by courts of justice.

It has been argued by the counsel for the defendants, that the views of the English courts are undergoing some change of late upon these subjects, and in confirmation of this view we are referred to Redfield on Rail. sec. 15, p. 663.  We see, however, no evidence of any substantial change of the doctrines stated by us, as the result of the decisions referred to.  On the contrary, Judge Redfield, on page 664, thinks there is no question that land owners and bridge and turnpike and existing railway companies, may stipulate for reasonable indemnity against injury from new railways as the price of withdrawing opposition, though he holds that the only proper mode of securing such indemnity is by inserting it in such charters.

Applying these principles to this case, it appears that the Vermont Central Railroad, while using the defendants' route below White River, opposed the passage of the bill dividing the defendants' original grant, and there is nothing tending to show that the opposition was upon other than private grounds. The court refused the instructions asked for, that plaintiff could not recover for his services in so inducing the Vermont Central Railroad to withdraw their opposition; but did instruct the jury that a threat to restrain the further unlawful use of that route, to induce that railroad to withdraw an unreasonable opposition to the bill, would not prevent the plaintiff's recovering for his services.

In the first place we think the court was right in declining to give the instructions asked for, because it could not be a conclusion of law that plaintiff was not entitled to recover, inasmuch as the evidence tended to show that the opposition was upon private grounds alone; and there was no evidence of a contrary tendency, and we think there was no error in the instructions actually given, because, according to the principles we have laid down, there could be no illegality in inducing the Vermont Central Railroad to withdraw an unreasonable opposition which was dictated by private and not public motives, by means of threats to prevent the further unlawful use of the defendants' franchise. There appears to have been no request for instructions as to the character of the opposition, whether upon public or private grounds, or whether the inducements to withdraw it were concealed or not from the legislature; and in the absence of anything further, it is to be presumed that proper instructions were given, and besides, there is no evidence of concealment, nor anything tending to show that the legislature was misled.

It is urged by the defendants that this division is in effect a new incorporation, and therefore that the defendants cannot be liable for services rendered in obtaining this division, which is alleged to be a new charter. The objection to the recovery for these services is based upon the decision in *Hall* v. *Vt. & Mass. Railroad Co.*, 28 Vt. 401; but it will be perceived that the doctrine of that case was that there was no implied promise to pay for services in obtaining a charter, and as there was no subsequent promise to pay, the plaintiff could not recover, and besides it is said that those services appeared to be voluntary.

We think, moreover, that this division must be regarded as a modification of the original charter, and that the original corporation still exists, although the extent of its franchise has been altered. In this respect it is much like towns and other municipal corporations, which may be changed from time to time by adding other territory, or taking from it a part of what originally belonged to it. So, as to railway and turnpike companies, which may receive extensions of their franchises without destroying their original charters. But, however this may be, the plaintiff's case is put upon the ground of an antecedent request by defendant, implied from taking the benefits of those services. By section 4 of the original charter of the defendant corporation, provision was made for the payment by the corporators of the expenses of surveys and examinations, and of preliminary surveys already made and making, and all manner of incidental expenses relating thereto, and it was

urged by the defendants' counsel that this provision excluded all liability for the services in question.

It will be perceived, however, that the plaintiff's claim is not put upon the ground of the liability of the corporation independent of any subsequent action or promise, as would be the case for services about surveys under that section, and therefore the maxim *expressio unius est exclusio alterius* can have no application, for here the plaintiff rests his claim upon subsequent acts of the defendant equivalent to a provision after the corporation was organized, and not upon any original obligation to pay. Even if the two cases stood upon similar footing the application of the maxim would, to say the least, be doubtful, for it is always to be applied with great caution. Broome's Legal Maxims, *506; but for the reasons before stated, it is unnecessary to consider this further.

The defendants' counsel asked for instructions that general notoriety was not competent to prove notice of plaintiff's services, and the court did charge the jury that mere notoriety was not of itself sufficient, but that the public nature of the services rendered might be considered in connection with other evidence, and in this we do not perceive any error. It is true that general notoriety is not evidence, and none such appears to have been received; nor do we understand that any effect was given to it in the instructions, but the jury were simply allowed to take into view the public nature of those services in connection with other evidence.

The evidence of what the plaintiff did to ascertain the pecuniary ability of some of the subscribers was proper to consider, to show the diligence of the plaintiff in this service.

It appeared from the testimony of E. B. Chase that he performed services of a similar character for the defendant, and that he neither claimed nor received any compensation; and it was proposed to read a clause in his deposition to the effect that it was understood and talked by the directors that they were to receive no compensation, it appearing that both the witness and the plaintiff were members of the first board of directors. This part of the deposition was rejected as incompetent, and we think rightly rejected. Assuming that it related to compensation to those who had obtained subscriptions, it must have been after those services had been rendered by the plaintiff, and these statements could only be admissible upon the ground that they were made by the plaintiff in his presence, and not objected to by him. That it was so talked by the directors without showing that plaintiff said to or was present at such conversation, would not tend legally to prove any admission by him; and before he can be affected by such evidence the proof must show him present at least, and in a situation to hear what was said. The case of *Stone* v. *Little*, 44 N. H. 610, is decisive on this point. It is urged that the term *the directors* necessarily means *all the directors*, but to this we cannot assent. It may, or may not, and we think it is for the party offering the deposition to remove the uncertainty, and that not being done the statement was rightly rejected.

It is urged further by the defendants' counsel, that the nature of the

plaintiff's services was such that they could not be rejected by the corporation. It was, however, determined otherwise in the former case. If the plaintiff had, by the request of a corporator and under a promise of compensation, obtained at considerable expense all the subscriptions for stock that were made, and, on presenting the books to the original corporators, with a statement of his services and his claim for compensation, they had accepted the subscriptions without objection to his claim, we think it quite clear that the corporation would be bound, as much as if the antecedent request had been made by an authorized agent of the corporation ; and this is substantially the ground upon which the plaintiff's case is here put. It is true, as urged by the defendants' counsel, that plaintiff was not all the time engaged in the act of obtaining signatures for stock, but his efforts to awaken an interest in the enterprise were but the preparatory steps in the work of obtaining the subscriptions.

Upon the subject of notice to the corporation of the existence of the plaintiff's claim, the defendants' counsel requested the court to instruct the jury that the corporation was not liable unless a majority of the original corporators promised he should be paid, or the corporation accepted the services and took the benefit of them, with prior notice that the plaintiff claimed compensation for them, and that notice to any number of the corporators short of a majority of them, or of the holders of a majority of the stock, would not be notice to the corporation.

The court declined to give them instructions in form requested, but did instruct the jury "that to bind the corporation by such ratification, it would be essential that it had previous knowledge or notice of the existence of the claim, or of the material facts upon which it was founded, or that it was put upon inquiry with respect to it; and as to what should be regarded as sufficient notice, and what should put the stockholders upon inquiry, they were instructed that if the holders of a majority of the stock, at the time when the corporation was organized by the choice of officers, had such information of what had been done by the plaintiff in the business of the corporation as would lead them to understand that he had performed services for which he was justly entitled to compensation from the corporation, and without inquiry proceeded to organize the corporation, and so received the benefit of his services, the corporation would be bound to pay him a reasonable compensation for the benefit received. As we understand it, this is in accordance with the views laid down in the former case. It is very clearly not necessary that the precise character and extent of the claim should have been notified to the stockholders, but it is enough to put them upon inquiry to have notice that services have been rendered of such a nature as to raise the presumption that they were to be paid for. The fact that some services of a similar character were often, or usually, rendered without compensation, could not affect the principle of law that was to guide the jury, although it might very properly bear upon the question whether compensation might reasonably be claimed. Whether it might or might not be in this particular case, would depend in some degree upon the extent of those services, their value, the amount of time and

money expended in performing them, and a variety of other circumstances, all of which it would come within the province of the jury to consider.

It is urged, also, that, the court declined to instruct the jury as requested, that the plaintiff could not recover unless a majority of the original corporators promised that he should be paid, or unless the corporation accepted them, &c. ; and the defendant calls attention to the statement in the case that in the course of his services he was requested in letters and otherwise by some of the original corporators, to persevere in his exertions ; and it is urged that the jury, for want of the instructions prayed for on this point, may have understood that such a request would bind the corporation. It will be perceived, however, by the case that the persons who took the principal lead in the movement of getting up the stock were not then corporators, and that it was with them he was chiefly in communication, they having assured him he should be paid for his services, and the injury to his business.

The instructions to the jury obviously put the case upon the ground of acceptance and ratification by the corporation, and not upon the ground of a previous promise by the original promoters or grantees. The court says that though the promoters of the enterprise who undertook to employ the plaintiff had no authority to bind the corporation by a contract, yet if the plaintiff went on in an arrangement with them to perform such services, and the defendants, with due notice, received the benefits of them, they would be deemed to have ratified the arrangement so far as to be bound for the services, if they were not gratuitous.

In this, we think that in the terms, " promoters of the enterprise who undertook to employ the plaintiff," may fairly be included the original grantees, and therefore it must be considered as assumed by the court that they had no authority to bind the corporation ; and so we think it must have been understood by the jury. If there was any reason to apprehend that the jury might have been misled on this point, the verdict ought to be set aside, but upon a careful consideration of the case we see no reason for such apprehension.

It is urged, also, that, as there was no express promise to pay, a previous request was necessary ; and as there was no party in existence to make such a request, the action must fail. This point, however, was fully considered in the former case, both upon principle and authority, and we are fully satisfied with the conclusion there reached. The English cases cited, in repeated instances, hold that an arrangement made by the promoters of railway enterprises, previous even to any act of incorporation, may become obligatory upon the corporation afterwards created, where they had accepted the benefits arising from it ; and this, even, where that benefit was merely the withdrawing of opposition to the act of incorporation. In those cases, there was clearly no party in existence when the arrangement was made that could be bound. Here, it was otherwise, for the grantees had been incorporated.

It appears in this case, that, on the plaintiff's objecting to engaging in this business on account of his own private affairs at home, he was assured by the promoters of the enterprise before referred to, that he

should be paid for his services and the injury to his business; and the court instructed the jury that although they could not give the plaintiff anything on account of damage to his private business, yet when they came to inquire what the nature of the plaintiff's services was, they were at liberty to consider the value put upon the services by the persons who employed him on account of the corporation, as a circumstance tending to show what the value of his services was; and if those persons said he should be paid for the amount of the damage to his business, that was an indication of the value which they put upon the services. As an estimate, simply, of the value of those services, they could not, we think, be considered by the jury, because these persons could not be regarded as authorized to act for the corporation; and therefore it was immaterial what value they put upon his services.

If this point of the charge can be sustained, it must be upon the ground that payment for these services according to the promise made by the promoters of the enterprise, was part of the burden assumed by the defendants when they accepted the benefits of that arrangement. As has been stated before, the instructions to the jury put the plaintiff's right to recover upon the question whether the defendant corporation, on due notice of the terms on which these services were rendered, accepted the benefits arising from them, and thus ratified the agreement under which they were performed; and we think it must be assumed that the jury have found such acceptance and ratification, otherwise the verdict must have been for the defendant.

In that aspect of the case the agreement between the plaintiff and these persons must be considered as accepted and ratified by the defendants, provided they had due notice of it; and on that point the instructions were that the defendants should have had previous knowledge or notice of the existence of the claim, or of the material facts upon which it was founded, or that it was put upon inquiry in regard to it.

The material facts on which the claim was founded were the arrangement with the promoters of the enterprise to render these services, and that he should be paid for them and the damage to his business, and the fact that he did render them; and it would seem to follow, from the acceptance and ratification by the corporation, that it was bound to pay the plaintiff according to the terms of that agreement.

In this view of the case the instructions of the court were sufficiently favorable to the defendants. The court, indeed, might have gone further, and have directed the jury that if they found that the defendants, after due notice, had accepted the benefits arising from the plaintiff's services, rendered in pursuance of this arrangement, they would be bound to make good the promises of compensation, instead of directing them that they might consider the value put upon those services by these persons, when they promised to pay the plaintiff for the damage done to his business. If, then, there was any error in this part of the instructions, it was not in favor of the plaintiff; nor do we perceive that in any state of the case it could prejudice the defendants.

With these views there must be

*Judgment on the verdict.*